UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

HOLLAND LOADER COMPANY, LLC,                  :
                                              :
                               Plaintiff,     :
                                              :
                     -v -                     :
                                              :
FLSMIDTH A/S,                                 :
                                              :
                               Defendant.     :

--------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/2/18

1:16-cv-6706-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

After devoting his life to mining, mining engineer Steven Svatek seized a golden opportunity to provide for his retirement. Struggling to build the success of his company, a small firm that lacked the resources to promote and sell its bulk materials handling products, Svatek accepted the offer of an internationally established mining systems provider to purchase his company's intellectual property so that the global behemoth could market and develop it. In acquiring the intellectual property, Defendant FLSmidth A/S agreed to use commercially reasonable efforts to actively promote the acquired products and to develop new technology based on the acquired intellectual property. Svatek's company, Plaintiff Holland Loader Company, LLC, was to receive a percentage of Defendant's sales of the products during a five-year earnout period provided for by the parties' contract. As part of the negotiated deal, Svatek also accepted an employment position with one of Defendant's subsidiaries and contributed to a key aspect of Defendant's developing business as Defendant's only U.S. mining engineer.

It was not long before Svatek saw his dream begin to crumble. Although Defendant entered into licensing agreements with each of its more than fifty subsidiaries to allow the entirety of its company to develop and promote the Holland Loader products, little more was done to market and design the products. Rather, it became increasingly clear that Defendant's motivation in contracting

with Plaintiff was to acquire, not the intellectual property, but the expertise that Svatek could bring to its business. After little performance, and with two years of the earnout period remaining, Defendant officially tabled any efforts in connection with the Holland Loader products and terminated Svatek's employment, while retaining its rights to the intellectual property.

Plaintiff brought this suit, alleging that Defendant breached the parties' contract by failing to use commercially reasonable efforts to actively promote and develop the acquired assets. The Court held a bench trial from February 5 to February 8, 2018. Having considered the parties' pretrial submissions and the evidence presented at trial, the Court concludes that Plaintiff has shown by a preponderance of the evidence that Defendant breached its obligation under the contract. Nonetheless, because Plaintiff has failed to prove its damages with a sufficiently reasonable degree of certainty, the Court is constrained to enter judgment in favor of Defendant. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

## I.   FINDINGS OF FACT

### A.  The Parties and their Products

Plaintiff Holland Loader Company LLC ("HLC") is a limited liability company organized under the laws of Colorado with its principal place of business in Colorado. HLC produces equipment used in bulk materials handling. Its products consist of large material handling equipment used in civil engineering and surface mining projects. These products include belt loaders and unidirectional loaders that are used as excavation machines. They are propelled by bulldozers or are self-propelled and cut into earthen material in order to loosen it. The loaders then collect the loosened material and discharge it. The discharged material may be conveyed into a truck or trailer or deposited directly onto the ground. HLC's other featured product, the dozer trap, is a stationary belt loader. Bulldozers push material into the dozer trap, which collects and discharges it.

The HLC product line also features off-road trucks and trailers, as well as traveling conveyors that receive, transport, and deposit material a short distance. HLC's president and managing member, Steven Svatek, is an experienced mining engineer who, on January 1, 2006, acquired over ninety-seven percent of HLC's membership interests, which he still holds today.

Defendant FLSmidth A/S ("FLS A/S") is a Danish corporation with its principal place of business in Denmark. Defendant is the parent company of over fifty subsidiaries worldwide. The FLSmidth company ("FLS")[1] has operated for 135 years and is an established supplier of bulk materials handling products in the global mining market. FLS sells customized systems and solutions for minerals and mining applications. Defendant, as the parent company, holds any intellectual property owned or obtained by the FLS family and enters into licensing agreements with each of its subsidiaries. Among those licensing agreements are a technology license agreement, a trademark license agreement, and a research and development agreement. FLS A/S itself performs no sales or engineering work. Rather, the licensing agreements permit all of Defendant's subsidiaries to develop, promote, and sell all of the FLS technologies.

FLS uses timekeeping software to track its employees' work hours and project expenses. Charge codes are typically assigned to (1) project execution, *i.e.*, post-sale detailed engineering work based on a customer's technical requirements, (2) approved research and development ("R&D") projects, or (3) "overhead," also known as "general admin." Generally, project execution is prioritized at the expense of internal R&D projects. Defendant manages the allocation of R&D funds based on requests by its subsidiaries. All projects and product lines compete for funding on a global level, based on FLS's R&D budget. Allocations are made based on an analysis of the project or product's impact on FLS's global business. In order to make informed allocation decisions,

---

[1] In referring generally to the FLS global entities, without specific reference to any one of the entities in particular, the Court uses the term "FLS." When referring to a specific FLS entity, the Court uses that entity's name.

Defendant requires its subsidiaries to submit a business case for all R&D funding requests. Defendant evaluates the competing business cases and makes R&D allocations considering the individual project's attractiveness to the market, past sales performance, revenues, profitability, and FLS's ability to sell a product line.

Every subsidiary also has its own limited budget for purposes of internal projects and general expenses. If Defendant decides not to allocate part of its global R&D budget to a project, or if an R&D request is pending, a subsidiary may decide, nonetheless, to finance and proceed with that project using its own overhead. Overhead charges encompass all internal expenses without distinguishing between individual items.

At FLS Spokane, Inc., the subsidiary located in Spokane, Washington and the center of much of the conduct at issue in this case, R&D Department Manager Willem Fourie devised an internal financing mechanism for projects without pre-approved R&D or project execution charge codes, whereby engineers could work on the project and charge their time accordingly. These time entries would then either be booked to project execution if the product in question was sold, or to R&D if global funds were subsequently assigned. If neither was the case, any expenses related to that internal project would be charged to overhead.

### B. The Parties Test the Soil for a Long-term Relationship

Prior to 2012, HLC's ability to grow as a business was limited. The company's promotional and sales capacity was not up to industry standards, and the company was unable to offer potential customers the substantial financial and commercial guarantees that they demanded. Because of its limited resources, HLC was only able to sell one belt loader, two used trailers, and spare parts between 2002 and May 2012. The belt loader was sold with a refurbished frame at a price of approximately $500,000. The company also owed an internal debt in the approximate amount of $500,000.

4

In 2005 or 2006, Svatek met Darrell White, former president and CEO of FLS Spokane, at a mining trade show in Las Vegas. White was impressed with Svatek's expertise as a mining engineer and on several occasions retained Svatek as a consultant. In 2007, FLS engaged Svatek's consulting services in connection with a mining project in Australia. Shortly thereafter, Svatek and White began talks regarding a possible acquisition of HLC by FLS. These talks went on over the course of four years, during which Svatek continued to consult with FLS.

In the spring of 2012, after several rounds of negotiation between White and Svatek, White worked with members of the FLS group executive management team to draft a memorandum proposal to be presented to the FLS board of directors recommending the acquisition of Holland Loader products. That memorandum, dated April 30, 2012, identified new technology, a bidirectional loader, that could be developed based on Holland Loader intellectual property by incorporating the existing unidirectional loader. The machine would save the user time by cutting down the line in one direction and then continuing to cut on the return trip, rather than making the return trip without performing additional cutting. The executive management team projected that a prototype of the bidirectional loader would cost approximately $1 million in research and development (R&D) funds and that once marketed, the machine would sell for approximately $15 million.

The April 30, 2012 memorandum also included projections of revenue expected on an annual basis from FLS's acquisition of the Holland Loader products. According to those projections, $1.5 million in gross revenue was expected by the end of 2012, with the figure reaching $30 million in 2015 and $36 million in 2016. As Darrell White acknowledged at trial, however, those figures were not based on any historical data. Rather, the numbers represented the figures that he and a colleague believed the board of directors would need to see in order to approve the acquisition.

Another benefit of the proposal, and one more important to FLS, was the acquisition of Svatek's mining engineering expertise. White considered Svatek to be an "indispensable asset," one that would add value to FLS, not only because of his knowledge of the Holland Loader products, but primarily because of his potential to contribute to the company's in-pit crushing and conveying ("IPCC")[2] business. At the time of Svatek and White's negotiations, FLS was pushing to develop its IPCC business. Indeed, the April 30, 2012 proposal to the FLS board noted that the commercial risk of acquiring the Holland Loader products was low in part because Svatek would be employed by FLS. The proposal highlighted FLS's previous work with Svatek, his recognition as a mining engineer, and the fact that Svatek was a "technical resource" that FLS did not have at that time.

## C. Defendant Accepts the Bid

The FLS board of directors approved the proposed acquisition of Holland Loader products, and on May 25, 2012, Svatek and White executed an Intellectual Property Purchase Agreement (the "IP Agreement") respectively on behalf of HLC as seller and FLS A/S as buyer. The IP Agreement provided for the sale of HLC's intellectual property; "all brochures, advertisements, marketing materials, web pages, erection manuals, maintenance manuals, operation manuals and all other similar documentation relating to the Products or the Business (in each case, in paper and electronic format)"; and "all rights to recover past, present and future damages for infringement or misappropriation of the Intellectual Property." Together, these assets are referred to in the IP Agreement as the "Acquired Assets." The IP Agreement defines "Products" as "the products of Seller that incorporates [sic] any Intellectual Property, which includes without limitation belt loaders (series 600, 610, 650, 660, 700 and 710), tractors and trailers (series 400), mobile conveyors (series TC80), dozer trap, smaller trailers (80-120 ton), equipment dollies, specialty rippers and any and all

---

[2] IPCC systems are designed to eliminate to the largest degree possible the use of trucks in a mining project. They provide an inexpensive tool to excavate and convey loose material.

derivatives or predecessors of such product." "Business" is defined as "the business of the design, development, manufacture, supply, use, maintenance, installation, import, distribution or sale of the Products, but excluding any consulting services performed within the metals and mining industry."

At the core of the parties' controversy lie two other provisions of the IP Agreement: the earnout provision and the "commercially reasonable efforts" provision. First, in exchange for the Acquired Assets, Defendant agreed to make various payments to Plaintiff under the agreement's earnout provision. Defendant agreed first to make an initial payment of $350,000.00 at closing. The parties also agreed that, for a period of five years immediately following the closing date, Defendant would pay Plaintiff certain percentages of the gross sales of products that incorporated the acquired technology. These payments are set forth in Section 3.1(b) of the IP Agreement, the "Earnout" provision, which reads: "During the five (5) year period immediately following the Closing Date (the 'Earnout Period'), Buyer shall pay to Seller an incentive based earnout (the 'Earnout') equal to: (i) ten percent (10%) of Buyer's gross sales of Products; (ii) five percent (5%) of Buyer's gross sales of products or equipment developed by Buyer after the Closing Date that are substantially based upon or that substantially incorporates the Acquired Assets; and (iii) one-half of one percent (0.5%) of Buyer's gross sales of products not related to the Acquired Assets where the Parties agree that the efforts of Principal [Svatek] were instrumental in obtaining the order." The maximum amount of Earnout payable under the agreement was $4 million. The IP Agreement provided that the first Earnout payment was due on December 15, 2012 in "an amount equal to the greater of: (i) the Earnout amount calculated in accordance with the foregoing paragraph [the Earnout provision] or (ii) Three Hundred Fifty Thousand Dollars."

The second provision at the heart of the parties' controversy, the "commercially reasonable efforts" provision, is found at Section 6.1(b) of the IP Agreement. That section provides that "[d]uring the Earnout Period, Buyer shall use commercially reasonable efforts to actively promote

the sale of Products and to further develop new products that substantially incorporate the Acquired Assets."

In addition to the sale of HLC's intellectual property, the IP Agreement contemplated FLS's employment of Svatek. The Agreement contains the defined term "Employment Agreement," which is "an employment agreement for a term of up to five (5) years between Principal," defined as Steven Svatek, "and Buyer," defined as Defendant, "or Buyer's affiliate." The employment agreement was to be effective upon the closing of the IP Agreement, which Section 4.1 provides would be upon the execution of the IP Agreement.

### D. Defendant Gears Up for Concrete Results

True to the terms of the IP Agreement, FLS Spokane entered into an at-will employment contract with Svatek on the date of execution of the IP Agreement. Svatek was the most knowledgeable person about the Holland Loader products and, as a FLS employee, shared some responsibility for promoting and developing the Holland Loader assets. Svatek's primary responsibilities, however, were the provision of mining engineering services and the development of IPCC projects. David Holland, Svatek's immediate supervisor, and White repeatedly instructed Svatek to concentrate his efforts on his primary responsibilities and assured him that FLS would pursue the sale and development of the Holland Loader products.

Approximately one month after execution of the IP Agreement, White hired Tim Tash as a full-time product line manager for the Holland Loader products. Product line managers are typically responsible for sales and direct promotion of the products and oversee and support front-line sales personnel. Tash had over thirty years of experience working with Holland Loader products as a field operator. Next to Svatek, Tash was the most knowledgeable about the Holland Loader products. Prior to Tash's hiring, however, Svatek warned White that while Tash was a competent field operator, he had no experience in product development or sales, had never worked in an office

setting, and had limited computer and writing skills. Despite Svatek's expression of concern, White hired Tash at an annual salary of $80,000, explaining to Svatek that Tash would have the resources of FLS to help him. Tash's position was unique in that no other product line had an exclusively dedicated manager. With one exception, Tash's sole responsibility while employed by FLS Spokane was to coordinate, oversee, and support the engineering and sales efforts in connection with the Holland Loader products.

In addition to hiring Svatek and Tash, Defendant revised the trademark agreement between it and its subsidiaries to reflect the acquisition of the Acquired Assets and to allow all FLS subsidiaries to use, develop, promote, and sell the Holland Loader products. FLS Spokane also began a process of what the company termed "FLS-izing" the acquired products. This process involved reformatting the product designs and running various control checks.

The purpose of FLS-izing the designs was to ensure that the Holland products could be offered to customers without incurring the risk of contractual liability. Unlike with standardized and mass-produced products, systems sales in the minerals and mining market are generally made based upon proposals consisting of a budgetary quote supported by concept and general arrangement drawings. FLS customers generally do not expect detailed drawings as is the case with standardized and mass-produced products. If the customer decides to purchase a conceptualized system or solution, further detailed engineering work is done to develop the final product based on the customer's technical specifications. In that context, detailed drawings and specifications are only expected months after the actual purchase is made. In light of this modus operandi, a product or system sold in the minerals and mining market is generally deemed "ready for sale" when it is conceived and conceptualized. Indeed, FLS frequently sells multi-million-dollar projects based solely on concepts and studies. Examples include a sale of a $100 million system to Fortescue Metals Group as well as a $200 million overburden removal system sold to the Tutupan mine in

Indonesia. Whether a design or concept is sufficiently developed to be sold pursuant to FLS's business model is generally a matter of risk management. Accordingly, FLS's internal sales procedures require that certain structural, mechanical, and safety standards be met. FLS must be satisfied that it will be able to comply with the customer's technical, logistical, and contractual requirements before selling a conceptualized solution.

Most of the Holland Loader product designs acquired by FLS were delivered in hard copy and did not conform to FLS's structural and mechanical design and safety standards. The products had primarily been sold in the construction industry prior to acquisition and also required design changes for use in mining applications. To bring the designs into compliance with FLS's high standards, FLS needed to first transfer all but one of the loader designs into electronic format. That conversion process required that FLS employees organize the drawings, convert the drawings into electronic models, create assembly and fabrication drawings from those models, check the drawings, submit the drawings to another department for final review, correct any redlines received after the final review, and assist with the release process. The designs also had to undergo various levels of quality control review. Tash's primary responsibility upon his hiring was to assist in the conversion of the Holland Loader designs. Tash was also responsible for drafting budgetary proposals because, as White explained in a September 2012 email, Tash and Svatek were the only employees with an understanding of the Holland Loader technology.

FLS also took some initial steps toward development of the bidirectional loader, which was considered an internal FLS Spokane project. At the time of the IP Agreement's execution, no R&D funds had been allocated to the bidirectional loader, or to any other product to be developed with Holland Loader technology. The project was not assigned a charge code for purposes of FLS's timekeeping software, but the work performed on the loader's development was charged as overhead. During a June 2012 meeting, David Holland and other FLS personnel, including Svatek

and Tash, discussed the possible applications for the bidirectional loader. A few months later, in November 2012, a functional description and design-requirements proposal were drafted. Development of the new loader was thereafter shelved, however, and no engineering work was performed.

FLS additionally initiated a process of updating the promotional materials related to the Holland Loader products. The existing HLC website contained a list of products with expanded descriptions, promotional brochures, and video footage showing the products in action. By December 2012, the old Holland Loader website had been updated with FLS graphics, and pages of the Holland Loader website that were marked as "under construction" were linked to the FLS website. The contact email address was also changed from a Holland Loader email address to a FLS address.

### E. FLS Spokane Dumps the New Zealand Steel Bid

While the conversion process was ongoing, FLS Spokane was working on the possible sale of dozer traps to New Zealand Steel, a company known for its strict bidding and delivery schedule requirements and enforced liquidated damages provisions. This project was conceived prior to Defendant's acquisition of the Holland products, and FLS Spokane had submitted a budgetary quote for the dozer traps on May 16, 2012, nine days before the formal execution of the IP Agreement. Three months later, on August 27, 2012, New Zealand Steel issued a request for tender with design specifications that differed from those in the initial budgetary quote. The request for tender required that FLS Spokane submit a bid within fourteen days. The request for tender also required delivery of two dozer traps by January 2013 and provided for liquidated damages in the amount of two percent of the sale price for each week of delay, up to thirty percent of the sale price. FLS Spokane determined that much of the costing, design analysis, engineering, and commercial vetting of the dozer traps would not be completed by the bid submission deadline. The January

2013 delivery date also provided a shorter delivery period than FLS's standard period of eight months for dozer traps. In light of the high likelihood of a late delivery, the fact that no extension could be obtained from New Zealand Steel, and the liquidated damages clause contained in the request for tender, FLS Spokane's management concluded that the project was not feasible, and FLS Spokane did not submit a bit. New Zealand Steel ultimately chose to construct the system itself.

### F. FLS Spokane's Plans Do Not Pan Out – Stopping the Bleeding

The end of 2012 and the year of 2013 were marked by a decline in FLS's business. Darrell White left the Spokane office in late 2012 to relocate to Europe. The following year, the global mining market suffered a downturn. The downturn forced various mining companies into bankruptcy or to substantially limit their capital expenditures and order intake. Revenues within the industry plummeted.

FLS also faced its share of difficulties. After the process of FLS-izing began, FLS's materials handling division encountered difficulties in project execution. Projects were faced with serious engineering challenges and overruns in the engineering schedule, causing many projects to run behind schedule. Addressing the losses incurred in connection with project execution, former Group Executive Vice President and President and CEO of the Materials Handling Division Carsten Lund implemented an efficiency program known as "Stop the Bleeding." Under that program, strict restrictions for bidding parameters were imposed and risk mitigation practices were implemented. The materials handling division was required to limit bids to only select, low-value, and low-risk projects with high margins. Order intake was significantly reduced, and legacy projects, or projects with historical sales, were prioritized. The program intentionally limited FLS's attention to products that had not previously been designed or built.

In light of FLS Spokane's reduced resources because of Stop the Bleeding protocol, responsibility for most of the conversion work for the Holland Loader designs was transferred to

FLS's India office. Before leaving Spokane, White sent two engineers, Jake Cully and Josh Porter, to the India office on two separate occasions to manage the local engineering team and to oversee the design conversion process. In addition to the conversion work done by FLS India, the designs were also required to undergo engineering reviews, safety reviews, structural reviews, and design reviews.

A year after the IP Agreement's execution, conversion of the Holland Loader designs was still ongoing. In May 2013, Josh Porter, one of the two engineers overseeing the design conversion process in India, emailed Tim Tash with a series of questions that he had regarding the designs. Two months later, Porter estimated that it would take approximately eight months to complete the conversion of the series 600, 610, and 710 loaders and the dozer trap, and that once conversion was complete, audits, engineering reviews, safety reviews, structural reviews, and design reviews would then be needed. The conversion process was not a high priority, however, and there existed no budget dedicated to the work. Rather, the offices in Spokane and India would get the "left over" resources: if there was a lull in other work, employees in those offices would devote time to the conversion process, but if other work was required of the offices, personnel was pulled from the conversion to the other projects.

Despite the market downturn and the incomplete design conversion process, FLS did some work in connection with the Holland Loader products. In May 2013, an FLS IT manager flagged Holland Loader's website as still in need of integration into the FLS site, yet that integration was not completed for another five months. Once the site was integrated into the FLS website, most of the Holland Loader content had disappeared. FLS Spokane also revised existing Holland Loader brochures, creating new graphics for some of the brochures while leaving other decades-old graphics in place. These marketing materials included general dimensions and basic operating parameters for the Holland Loader products. A Global Material Handling Brochure listed the Holland loader among thirty-five other products, and a short description of the Holland loader indicated that the

loader was well suited for projects such as highways, airports, dams, irrigation and flood control, among other applications.

In April 2013, FLS Spokane submitted a budgetary proposal to Southern Ionics Mining for a dozer trap. Also that year, FLS Spokane sold a customized dozer trap to Kumba Iron Ore. The dozer trap was designed in accordance with the customer's specifications, which changed numerous times throughout the sales process. The customized dozer trap was sold based merely on a concept, was not ready for manufacture when the concept was purchased by Kumba, and required substantial post-sale engineering work. The design and sale of the Kumba dozer trap was carried out through Defendant's subsidiary in Buffalo, South Africa, and supported by a team from Spokane, which included Holland, Tash, and Svatek. Unfortunately, FLS allowed the dozer trap to be installed in an improper application. Ultimately, the dozer trap was buried under a stockpile, which caused a structural deformation. Kumba returned the dozer trap, and FLS refunded the sale in its entirety.

By the middle of 2013, support for the Holland Loader products was increasingly waning. Tash and Svatek were the primary FLS employees pursuing sales leads, and those leads were predominantly from former Holland Loader customers in North America. Interest was noted in India, Indonesia, and South Africa as well, though internal FLS email correspondence acknowledged that FLS had not "made a strong push to capitalize on the sales structure" in those countries. At that point, there was no training program in place to educate FLS employees regarding the Holland Loader products. Darrell White invited individuals from all over the world to attend a three to four-day training event in Houston, but Svatek was given only fifteen to twenty minutes during that event to provide an introduction to the Holland Loader products.

Also by mid-2013, FLS had spent 976 of its allotted 1,360 engineering hours on developing a new model dozer trap—the DT6000—but had not yet completed its development. A modest 202 hours had been expended on developing the bidirectional loader, but again, with no prototype

completed.  The Stop the Bleeding program was implemented at the expense of product lines for which there had been no sales, including the Holland Loader products in development.  In email correspondence to Svatek, White expressed the idea of amending the IP Agreement to add an additional year to the earnout period, noting that "we have lost the first" year.  A few months later, another internal FLS email acknowledged that FLS "never capitalized" on the Holland Loader products.

In December 2013, Spokane merged with FLS Salt Lake City, Inc., becoming FLS USA, Inc.  FLS USA maintained a Spokane office.  Despite the reduction in personnel that ensued, FLS USA kept Svatek and Tash on as employees.

Over the next several months, FLS sales staff provided some budgetary quotes for Holland loaders and dozer traps.  In April 2014, FLS USA submitted a proposal to Glencore Antapaccay for a dozer trap.  Also in the first half of 2014, sales staff in FLS's Indonesia and Australia subsidiaries, with Svatek's help, responded to inquiries regarding potential sales of Holland loaders.  None of those inquiries resulted in sales.

In July 2014, Tash and Svatek identified various impediments to the promotion of Holland Loader products and proposed an action plan to address those impediments.  The action plan included training of FLS personnel, appointment of regional managers who would be required to prepare monthly reports in connection with work on the products, and the completion of product brochures, promotional videos, and conference materials.  There is no evidence, however, that this action plan was implemented.

Later that year, the dozer trap frame returned by Kumba was offered for sale to Tata Steel in India in response to an inquiry from that client.  Three FLS subsidiaries—Spokane, India, and Buffalo—worked jointly on that project.  General arrangement drawings and a budgetary proposal were provided to Tata Steel in December 2014, but the customer decided not to go forward with the

project for reasons unrelated to FLS.

In September 2014, Tim Tash prepared training materials for FLS sales personnel—over two years after execution of the IP Agreement. A formal training program was never implemented, however. Rather, Tash, Svatek, and Holland provided training to FLS staff whenever the men happened to travel to other FLS sites.

The same year, FLS revisited the development of the bidirectional loader and the new dozer trap. Defendant increased the approved R&D budget for the new dozer trap, from 1,360 hours allocated in 2013 to a total of 5,713 hours in 2014. Of that budget, though, only 1,341 hours were actually expended. In late 2014, FLS management renewed the previously shelved discussions related to the development of the bidirectional loader. Despite email correspondence among FLS personnel in November 2014 regarding the need to move forward with the loader, the product was not developed beyond the concept drawings. Those concept drawings did not include engineering specifications and could have been completed in a matter of days.

Between late 2014 and May 2015, efforts were made in the Spokane office to sell Products to Canadian Natural Resources Limited ("CNRL"). Initially, FLS approached CNRL to promote the sale of a Holland loader for use in CNRL's oil sands project. CNRL had already committed to products offered by Defendant's competitor, Wirtgen. FLS suggested testing a unidirectional Holland loader first, but CNRL ultimately rejected the proposal due to establishment costs and CNRL's prior commitment.

### G. The Bleeding Worsens – Svatek's Dreams Are Crushed

The year 2015 sounded the death knell for earnout under the IP Agreement. Capital expenditure in the mining industry continued to fall that year. On January 1, 2015, Paul Emerson was appointed Global Product Line Director of the minerals material handling technology at FLS USA. During the month that followed, FLS's materials handling and minerals processing divisions

were downsized significantly. The materials handling division lost 1,000 employees in the process and, after downsizing, was left with a staff of only 100. The materials handling division merged with the minerals processing division to form one minerals division. In February 2015, the FLS-izing process of the Holland Loader products was still incomplete. The series 610 loader was still underway, and a new design was to be made for the dozer trap.

In early 2015, Paul Emerson returned to CNRL and attempted to sell the Canadian company a newly developed machine that would combine Acquired-Asset and salt-harvester technologies and be more economical than a Wirtgen machine. However, this was also rejected due to CNRL's commitment to FLS's competitor.

In light of the severe reduction in force and general scarcity of resources, company-wide product line workshops were held in the first half of 2015. These workshops sought to implement new product line management structures and assess product viability so that decisions could be made regarding allocation of FLS's resources. In preparation for an April 2015 workshop in Salt Lake City, all product line directors were asked to prepare presentations of their respective product lines, including past order intake and sales, market potential, product strengths and weaknesses, opportunities and risks, and portfolio business plans.

As Global Product Line Director in Salt Lake City, Paul Emerson evaluated various product lines, including the Holland products and acquired assets. He concluded that the Holland products were a non-performing product line and that the projected sales numbers could not be substantiated or justified. Nonetheless, he decided to combine the Holland products with a better performing product line, the FLS harvesters, for purposes of the April workshop. An April 2015 R&D proposal was also created in connection with the development of the dozer trap, noting that "since the acquisition, *without actively marketing the product*, FLS has received considerable interest in both existing

and downsized versions of dozer traps."[3]  A list of approximately sixty identified sales opportunities for Holland products showed interest in the products largely by former HLC customers and FLS subsidiaries.

Emerson's presentation of the Holland products in conjunction with the FLS harvesters was met with skepticism due to the lack of sales despite prior allocation of resources.  FLS management decided to drastically reduce support for all non-performing product lines, including the Acquired Assets, in order to prioritize the selling product lines that carried the most promising business potential.

After this cut in support for the Holland Loader products, FLS removed the dozer trap DT6000 from the list of products to be developed and performed no further development work on the bidirectional loader.  FLS did respond to a few inquiries from potential Holland Loader customers.  In March 2015, the Spokane office submitted a proposal to Detour Gold for the sale of two dozer traps.  Later that year, in September, Spokane provided Ambitech Engineering with a budgetary proposal for two dozer traps.

The Spokane office also made meager attempts to sell the Holland Loader products in the construction market.  In April 2015, FLS USA submitted an unsuccessful bid for a Holland 700 loader and 180-ton belly dump trailer to be used in connection with a hydro dam construction project in Canada.  FLS USA also submitted a bid in connection with a port construction project in Rotterdam—a project that was subsequently cancelled by the customer due to funding issues. Nonetheless, by November that year, Darrell White explained in email correspondence, FLS had "done little to support selling Holland" and had "not actively promoted" the Holland products according to the "original strategy," *i.e.*, the IP Agreement.

In December, the office in Spokane was closed as part of the corporate downsizing.  Certain

---

[3] Emphasis added.

employees were offered the option to relocate to FLS's Salt Lake City office. Tim Tash, however, decided against relocation, and his employment was terminated. Svatek's employment was also terminated that month.

Leading up to the December 2015 closing, discussions were had between White and other management personnel regarding Svatek's retention as a consultant rather than an employee and the possible termination of the IP Agreement. At that point, FLS wished to sell the Holland Loader intellectual property and to terminate the IP Agreement. White and other management personnel held a discussion with Svatek regarding mutually agreeable terms on which FLS could terminate the agreement and Svatek would be retained as a consultant. The parties were unable to reach an agreement, however, and FLS retained the Acquired Assets. FLS did not, however, clarify the status of the IP Agreement with those individuals primarily involved with promoting the Holland Loader products. Indeed, Emerson believed, well into 2016, that FLS was no longer offering Holland technology.

On August 15, 2016, days before this case was filed, FLS's Mexican subsidiary received a request for a proposal for a dozer trap feeder to be used in connection with the El Gallo II mining project. Emerson directed FLS sales staff to provide a budgetary quote only if the feeder was of a size that FLS had previously quoted such that the product would be "relatively easy to quote." FLS USA did submit a budget proposal, but no sale was made. Other internal email correspondence showed the confusion about the status of the Holland Loader products; sales personnel in other regions were unsure if FLS still offered the products for sale. Also reflected in that correspondence was the fact that, over four years after executing the IP Agreement, FLS had only limited drawings of the Holland loaders to provide to interested customers.

In October, FLS USA responded to an inquiry by Landmark Construction for a unidirectional Holland loader to be used in a construction project. Internal email correspondence at

that time expressed concern about "current legal issues" with the Holland products, and a copy of that email chain was forwarded to Landmark when Emerson responded to the customer's inquiry. Emerson also explained in that email correspondence that because Svatek and Tash were no longer with the company, FLS was unable to provide a firm quote within the time frame requested by the client. Sales staff provided budget pricing and brochures, but no further interest was shown by the customer. Also that month, sales personnel provided a quote for Holland loaders to a prospective client after promising a quote several weeks earlier.

In November 2016, FLS personnel attempted to sell the Holland Loader intellectual property to a prospective client. Also in late 2016, FLS USA received an inquiry from AECOM regarding the use of series 610 and 700 Holland loaders in connection with a construction project in North Dakota. FLS USA provided AECOM with budgetary pricing, general drawings, and parts lists for the products, but has been unable to consummate a sale. To date, no sales of Holland Loader products have been made by FLS in either the construction industry or the mining industry.

Overall, FLS entities spent 2,058 hours on converting the dozer trap designs and 1,829 hours on converting the Holland loaders. Between July 2012 and August 2015, FLS invested approximately $394,000.00 in the legacy Holland Loader products, exclusive of the salaries paid to Tash and Svatek, time charged to overhead, travel expenses, and any design work on the bidirectional loader. The bidirectional loader and dozer trap DT6000 were never developed.

### H. Objective Industry Standards[4]

At trial, the parties introduced expert testimony regarding the objective standard by which Defendant's efforts under Section 6.1(b) of the IP Agreement should be measured. Plaintiff introduced the expert testimony of James Humphrey, a licensed professional mining engineer with

---

[4] The Court addressed the experience and qualifications of both parties' expert witnesses at length during its February 28, 2018 ruling on the record in connection with the parties' motions to preclude expert testimony. The experts' qualifications are not extensively repeated here.

over thirty-five years of experience in the global mining and construction industries. His most recent experience includes fifteen years as an employee of Caterpillar Inc., where Humphrey was involved in the development, promotion, and sale of mining and construction equipment. Humphrey testified that the Holland loaders compete with other excavation machines in the market; the Holland trailers compete with other cyclic trailers and transport systems, such a conveyors; and that the dozer trap competes with other deposition machines on the market. Humphrey explained that, when customers evaluate competing machinery, the primary factor considered is the total cost of operation ("TCO"). Because of this, a company like FLS must develop a product to a point where the company is able to describe and forecast the TCO, to convincingly explain the machinery's operational advantages, and to be in a position to provide firm bids with guaranteed delivery. Humphrey testified that a successful sale is near impossible if a manufacturer attempts to do all of these things only after receiving a request for a budgetary quote.

Humphrey also explained that the particular application for which the machinery will be used is important in identifying market opportunities, and that an understanding of the operational advantages and applications of a product is key to sales. In light of these considerations, Humphrey opined that the Holland Loader products, which could be sold as stand-alone products and not as FLS's traditional material handling systems, could be predesigned or even fabricated prior to a sale. And, because a diligent company would have expeditiously implemented the development and promotion of newly acquired products and the Holland Loader products had previously been built, Humphrey opined that FLS should have completed its design and engineering of the acquired products by the end of 2012.

Humphrey additionally explained various marketing strategies that are generally applicable in the industry, including Six Sigma, which he described as the industry standard methodology for documenting and controlling marketing processes. Those processes include the marketing

development plan, the product introduction plan, and the bidding process. To develop a marketing plan, a company analyzes the market itself and the competitive strengths and weaknesses of the product to be marketed, analyzes the potential users and the target market for the product, and generates sales forecasts and a plan for future development of the product. Humphrey also identified various elements of the product introduction plan that must be taken into account, including the identification of a product's fit within the company's business strategy and risk and profitability analyses, the establishment of a schedule for milestones and executive review, and a specific marketing plan that includes written advertising materials as well as the development of a promotional plan and sales training. A promotional plan, Humphrey explained, should identify the most effective means of communicating with the target audience and identify key opportunities such as the delivery plan for publication packages. The plan should also include milestones to be met in connection with scheduled promotional events, such as tradeshows, or the timed release of published materials or websites. With respect to sales training, Humphrey stated that sales personnel require training to be effective in identifying opportunities and generating customer interest.

Humphrey also explained at trial that effective brochures used as promotional materials include descriptions of the product's features and advantages in categories such as safety, maintenance, power systems, and others. Humphrey noted that typical brochures contain illustrations and photographs with links to related digital materials and videos.

Defendant's expert witness, Milan Sjaus, is an expert with more than twenty years of experience in the bulk materials handling business. During a large part of his career, Sjaus focused on introducing new "niche" products and solutions to the mining industry and on promoting established products in new geographical markets. Sjaus recently worked for one of FLS's competitors, Sandvik, where he grew revenues of the company's bulk materials handling business to

$200 million over the course of eight or nine years.  In 2014, Sjaus closed a deal with a project in Vancouver which contributed greatly to the company's revenues, which Sjaus explained had boomed between 2011 and 2014.

Disagreeing with Humphrey's views regarding FLS's ability to prefabricate the Holland Loader products and market them for individual sale, Sjaus emphasized that FLS's materials handling business is project or system focused.  According to Sjaus, FLS specializes in offering complex solutions, not in selling individual stand-alone products.  Sjaus explained that it is common practice for solutions providers to identify and fill any gaps in their offerings with product development or acquisition.

Because FLS's business is in providing complex solutions, Sjaus explained that pre-sale fabrication is not the norm.  Rather, solution and product development is specific to the customer's project, and prior to the identification of a specific need by a customer, only conceptual design work on a product is performed.  That conceptual work includes a basic overview of the product or solution that focuses on the application and key features and benefits, general layout drawings, and the development of basic functional descriptions to highlight technical solutions in areas that may be viewed by customers as potential risks.  Further engineering work is performed only after a request for tender by the customer, and detailed engineering is generally commenced only after an order for the product is submitted.  Sjaus further explained that a product or solution is deemed ready for market when (1) the conceptual design is prepared and internally reviewed for any fatal flaws; (2) basic pricing is developed; (3) estimates of preliminary delivery schedules are in place; and (4) generic proposal documents have been created to allow a budgetary proposal to be completed within two weeks and a firm bid to be prepared within four weeks.

In terms of marketing material, Sjaus described such materials as typically limited to brochures, pamphlets, presentations, and web-based content, all containing only basic equipment

information.  Sjaus also stated that large-scale marketing at trade shows and with advertising campaigns is usually avoided due to the narrow customer base.  Sjaus noted that companies may publish or present technical papers at conferences.

Sjaus also submitted that business management, including sales forecasting, is generally conducted in connection with the system as a whole, or a group of products, rather than on an individual product basis.  Forecasts usually focus on revenue from ongoing projects, and not on profits to be earned by the sale of each product.  Sales activities are nearly exclusively project-based, and the responsibility for sales and direct promotion of solutions or products lies with the product line manager.  Additionally, according to Sjaus, the Holland Loader products are suited for "niche" solutions, and the business development cycle in the mining industry for niche solutions is rather long, typically a three to five-year process.  Sjaus further explained that companies such as FLS identify potential customers for solutions sets through vigilant general business development efforts. Sjaus also explained that the mining industry is a highly conservative one in which companies are risk adverse.

## II.  CONCLUSIONS OF LAW

### A.  Scope of Evidence Considered by the Court

Plaintiff moved *in limine* to exclude evidence of performance under the IP Agreement by Defendant's subsidiaries.  Plaintiff argues that evidence of any performance under the IP Agreement by Defendant's subsidiaries should be excluded because such performance was undertaken in violation of the IP Agreement's assignment clause.  That clause, contained at section 8.14, reads as follows:  "Either party may assign or delegate any of its rights or duties hereunder to an affiliate of such party with the prior written consent of the other party, which consent shall not be unreasonably withheld, and any assignment made without such consent shall be void."

Before addressing the parties' arguments, the Court emphasizes that Plaintiff has not

brought a claim for breach of this particular provision of the IP Agreement. Rather, Plaintiff has only brought, and the parties have only tried, a claim for Defendant's alleged breach of section 6.1(b), which requires it to use commercially reasonable efforts to promote and develop Holland Loader products.

Defendant has advanced several arguments in opposition to Plaintiff's *in limine* motion. Among those arguments is the contention that the assignment clause contains a scrivener's error. In support, Defendant submitted redline versions of the IP Agreement from its drafting stage.

"The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (citation omitted). Thus, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* (quoting *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992)). Extrinsic evidence of the parties' intent may only be considered where an agreement is ambiguous, and "is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) (quoting *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 379 (1969)). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Id.* at 162 (citing *Van Wagner Advert. Corp. v. S & M Enterprises*, 67 N.Y.2d 186, 191 (1986)). "[A] contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citing *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264 (2007)). Conversely, "the language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.* (citing *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138-39 (2d Cir. 2000)). "When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms." *Id.* (citing *South Rd. Assocs., LLC v. IBM*, 4

N.Y.3d 272 (2005)).

In resolving whether an ambiguity exists, the Court must determine whether a clause is ambiguous "when read in the context of the entire agreement." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir. 1993))).  "If the document as a whole 'makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the [agreement].'" *Lockheed Martin*, 639 F.3d at 69 (alteration in original) (quoting *Kass v. Kass*, 91 N.Y.2d 554, 567 (1998)).

The language of the assignment clause at issue here is unambiguous.  The clause provides clearly that either party may assign its rights or delegate duties under the contract to its affiliate with the prior written consent of the other party.  Defendant has conceded that the language is not ambiguous, but argues that it is absurd and not in line with the parties' expectations.  While the clause allows for assignment or delegation to a *non-affiliate* without prior written consent, and this may indeed be nonsensical in light of the requirement of consent for an assignment or delegation to an *affiliate*, the unusual language does not render the provision ambiguous.  Therefore, the Court has not considered evidence outside of the four corners of the contract, including the submitted redline drafts, to determine the meaning of the language of the assignment clause.

Considering only the plain language of the contract, the Court is unpersuaded by Plaintiff's argument.  It is undisputed that Defendant is the parent company of over fifty subsidiary entities.  FLS A/S holds all of the intellectual property and licenses the IP to each of the FLS subsidiaries.  Darrell White testified that FLS A/S itself does no engineering work and does not engage in sales or advertising of any products.  Rather, all of the engineering, marketing, and sales work is undertaken by the FLS subsidiaries.

Reading the assignment clause in the context of the entire contract as a whole, as the Court is required to do, the Court concludes that the contract can readily be interpreted to permit Defendant to acquire the Holland Loader IP and to then license that IP to its subsidiaries in the course of Defendant's performance of its obligations under Section 6.1(b). Defendant is established as a holding company, and it conducts business by entering into various licensing agreements with its subsidiaries worldwide. Those subsidiaries employ engineers and sales staff to design, market, and sell FLS products. Given Defendant's business structure, it was reasonable for Defendant to direct its subsidiaries, which are capable of and experienced in marketing and engineering mining equipment, to actually perform the day-to-day work required by the IP Agreement. In fact, it would *not* be commercially reasonable for Defendant itself, as the holding company, to undertake the task of promoting and developing the acquired assets. This would require Defendant to undergo significant structural changes to allow it to engage in promotional activities or the development of products that incorporated the acquired assets. Defendant would be required to hire additional personnel, including engineering and sales personnel. Defendant would likely also be required to secure installations in which the products could be designed and, post-sale, constructed. These would be costly undertakings indeed. Just as Defendant is not required under the law to act against its own business interests in performing under this contract, Defendant would not be required to undertake such significant modifications to its business model. Therefore, a reading of the assignment clause as Plaintiff suggests would undermine the commercially reasonable efforts clause. *See Vestron, Inc. v. Nat'l Geographic Soc'y*, 750 F. Supp. 586, 693 (S.D.N.Y. 1990) (noting that an efforts clause "must be reconciled with other clauses in the contract to the extent possible, not used as a basis for negating them"); *accord Ashokan Water Servs., Inc. v. New Start, LLC*, 807 N.Y.S.2d 550, 556 (Civ. Ct. 2006); *In re Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003).

Even if the assignment clause could be read as Plaintiff suggests, Svatek, Plaintiff's principal

and holder of ninety-seven percent of HLC, implicitly waived any right to written consent prior to any delegation of promotional and developmental work to Defendant's subsidiaries. A known right may be waived by a "voluntary and intentional abandonment" of that right. *Jordan v. Can You Imagine, Inc.*, 485 F. Supp. 2d 493, 499 (S.D.N.Y. 2007) (quoting *Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 85 N.Y.2d 232, 236 (1995)). "Waiver may be established by affirmative conduct or by a failure to act that evinces the intent to abandon the right." *Id.* (citation omitted).

Here, Svatek testified that he did not care which entity performed the obligations of the IP Agreement, and in fact he expected that FLS affiliates would contribute to the performance of the contract. While Svatek may not have understood the entirety of the FLS business structure, he expected that FLS would put its global resources to work in promoting and developing the Holland Loader products. As a FLS employee, Svatek was aware of the efforts being undertaken by at least FLS Spokane, and he directly participated in some of those efforts. Svatek also traveled to other FLS subsidiaries and trained sales staff in those regional offices on the Holland Loader technology. There is no evidence that Svatek ever objected to the work being performed by FLS Spokane, or by any other FLS subsidiary, on the grounds that HLC had not provided written consent. To the contrary, Svatek repeatedly expressed his concern that the FLS subsidiaries were not providing sufficient support for the Holland products. Therefore, in light of Svatek's course of conduct during his employment at FLS Spokane, the Court concludes that Svatek effectively waived HLC's right to provide written consent prior to the delegation of any duties by Defendant to its subsidiaries. The Court accordingly has considered all of the evidence submitted at trial in connection with work undertaken by Defendant as well as its subsidiaries.

## B. Breach of Contract

The only claim presented for trial in this matter was Plaintiff's claim for breach of Section 6.1(b) the IP Agreement. "Under New York law, a breach of contract claim requires proof of (1) an

agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages. *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). The party asserting a breach of contract claim has the burden of proving each of these elements by a preponderance of the evidence. *See Prime Mover Capital Partners, L.P. v. Elixir Gaming Techs., Inc.*, 793 F. Supp. 2d 651, 674 (S.D.N.Y. 2011); *accord RJR Mech., Inc. v. Liberty Mut. Ins. Co.*, 618 F. App'x 29, 30 (2d Cir. 2015).

"A contract must be construed to effectuate the intent of the parties." *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 704 (S.D.N.Y. 2012) ("*MBIA I*") (citing *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)); *see Law Debenture Tr.*, 595 F.3d at 467 ("As a general matter, the objective of contract interpretation is to give effect to the expressed intentions of the parties." (quoting *Hunt*, 889 F.2d at 1277)). In interpreting a contract, courts "should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *MBIA I*, 842 F. Supp. 2d at 704 (quoting *Kass*, 91 N.Y.2d at 566). "[A] written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms." *Law Debenture Tr.*, 595 F.3d at 467 (second alteration in original) (quoting *Greenfield*, 98 N.Y.2d at 569).

### 1. Commercially Reasonable Efforts

The central issue in this case is whether Defendant used commercially reasonable efforts to promote and develop the Acquired Assets. "There is no settled or universally accepted definition of the term 'commercially reasonable efforts.'" *Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912, 926 (E.D. Cal. 2010). Nor have New York courts defined the term. *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 413 n.27 (S.D.N.Y. 2007). In fact, New York case law interpreting other efforts clauses, including best efforts and reasonable efforts clauses, is anything

but a model of clarity. *See Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 613 n.7 (2d Cir. 1979) (noting that the New York law on best efforts clauses "is far from clear and it is unfortunate that a federal court must have to apply it"); *Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys. LLC*, 842 F. Supp. 2d 502, 511 (S.D.N.Y. 2012) ("When interpreting the meaning of a 'reasonable efforts' clause, 'New York courts use the term "reasonable efforts" interchangeably with "best efforts" . . . .'" (quoting *Monex Fin. Serv. Ltd. v. Nova Info. Sys., Inc.*, 657 F. Supp. 2d 447, 454 (S.D.N.Y. 2009))); *Ashokan Water Servs.*, 807 N.Y.S.2d at 553 (reviewing New York case law and noting that "the verbal formulae that courts use when applying a 'best efforts' obligation often confuse rather than clarify" and include such diverse definitions as "due diligence," "all reasonable methods," "reasonable efforts," "good faith business judgment," "genuine effort," and "active exploitation in good faith" (citations omitted)).

Defendant argues in its trial memorandum that, to establish a breach of the commercially reasonable efforts clause, Plaintiff must show that Defendant's conduct was inconsistent with good faith business judgment. *See* ECF No. 73 at 5. For support, Defendant cites to *In re Chateaugay Corp.*, 198 B.R. 848 (S.D.N.Y. 1996), *aff'd*, 108 F.3d 1369 (2d Cir. 1997). *Chateaugay*, however, did not involve a commercially reasonable efforts clause, but rather a "reasonable efforts" clause. *See id.* at 854. The court stated that the "reasonable efforts" clause at issue imposed an "indisputably less stringent" standard than the "best efforts" clauses contained in other parts of the parties' contract, but that even in the context of a "best efforts" clause, a party may give "reasonable consideration to its own interests" and "thus exercise discretion, within its good faith business judgment, in devising a strategy for achieving its ultimate goal." *Id.* at 854-55 (citations omitted).[5] The court therefore

---

[5] It is unclear that, as a general rule, a "reasonable efforts" clause imposes a less stringent obligation than a "best efforts" clause under New York case law. Rather, the New York courts tend to treat the two terms interchangeably, suggesting that they each impose a similar performance obligation. *See Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 511 (S.D.N.Y. 2012) ("When interpreting the meaning of a 'reasonable efforts' clause, 'New York courts use the term "reasonable efforts" interchangeably with "best efforts" . . . .'" (citation omitted)).

explained that the plaintiff, to prevail on its claim that the defendant failed to use reasonable efforts under the contract, "must demonstrate that [the defendant's] actions were inconsistent with good faith business judgments." *Id.* at 855 (citing *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575-76 (2d Cir. 1994)).

In the decades following *Chateaugay*, courts have struggled to define the relationship between the implied obligations of good faith and fair dealing inherent in every contract and express efforts clauses.[6] "Traditionally, 'good faith' in New York has been a subjective concept." *Ashokan Water Servs.*, 807 N.Y.S.2d at 554; *see also Chemical Bank of Rochester v. Haskell*, 51 N.Y.2d 85, 91 (1980) (explaining that "good faith" as used in the Uniform Commercial Code is a subjective, not objective, standard and noting that a proposed draft of the Code that "explained good faith in terms related to commercial reasonableness was amended" to make clear that the inquiry under a "good faith" standard is only what the party actually knew, not what the party should have known); *DH Cattle Holdings Co. v. Smith*, 607 N.Y.S.2d 227, 211 (1st Dep't 1994) (noting that "good faith . . . is a subjective and not an objective standard"). Since Judge Friendly's landmark opinion in *Bloor*, in which he concluded that a review of New York case law suggested that "a 'best efforts' clause imposes an obligation to act with good faith in light of one's own capabilities," *Bloor*, 601 F.2d at 613 n.7, courts have held that a "best efforts" clause imposes an obligation to act with good faith. *See, e.g.*, *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 124 (2d Cir. 2013) (stating that the obligation imposed by a "best efforts" clause as framed by Judge Friendly "persists today"); *Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. United Tech. Corp.*, 230 F.3d

---

[6] Interestingly, of the eight cases that cite *Chateaugay*, only the Southern District of Texas cites the case in connection with its discussion of the good faith business judgment standard. *See Musket Corp. v. Suncor Energy (U.S.A.) Mktg., Inc.*, No. H-15-100, 2017 WL 896510, at *6 (S.D. Tex. Mar. 7, 2017), *appeal filed* (5th Cir. June 12, 2017). The Southern District of Texas did not explicitly define the relationship of the good-faith-business-judgment standard with a commercially reasonable efforts clause, but noted, in the absence of a contractual definition of "commercially reasonable efforts," the need for expert testimony "as to whether the business judgments of the alleged breaching party were good faith business judgments" in the context of "an industry with which the ordinary trier of fact will be unfamiliar." *Id.*

569, 578 (2d Cir. 2000) ("Based on cases interpreting 'best efforts' language . . . , we think [the party] must 'actively' and 'in good faith' pursue the goal of maintaining bargaining unit work." (brackets and citation omitted)); *Soroof Trading Dev. Co.*, 842 F. Supp. 2d at 511 ("[A] best efforts clause imposes an obligation to act with good faith in light of one's own capabilities." (quoting *Monex Fin. Serv.*, 657 F. Supp. 2d at 454)); *Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 03-cv-3120 (LTS) (THK), 2011 WL 4348138, at *2 (S.D.N.Y. Sept. 15, 2011) ("Courts generally interpret a 'best efforts' [clause] to require the promisor to 'act with good faith in light of one's own capabilities.'" (quoting *Ashokan Water Servs.*, 807 N.Y.S.2d at 554) (citing *Bloor*, 601 F.2d at 613)); *Bd. of Managers of Chocolate Factory Condo. ex rel. Chocolate Factory Condo. v. Chocolate Partners, LLC*, 992 N.Y.S.2d 157, ___, 2014 WL 1910237, at *7 (Sup. Ct. 2014) ("'[U]nder New York law, a best efforts' clause imposes an obligation to act with good faith in light of one's own capabilities,' and apply 'such efforts as are reasonable in the light of that party's ability and the means at its disposal and of the other party's justifiable expectations.'" (alteration in original) (quoting *Ashokan Water Servs.*, 807 N.Y.S.2d at 555)).

Nonetheless, because the warranty to act in good faith inheres in every contract, "the relationship between 'best efforts' and 'good faith,' 'fair dealing,' and 'reasonable care'" remains unclear. *Ashokan Water Servs.*, 807 N.Y.S.2d at 553; *see Travellers Int'l A.G.*, 41 F.3d at 1572, 1576 ("Under New York law, the implied covenant of good faith and fair dealing inheres in every contract." (citing *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 45 (1972))); *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002) ("In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance.").

What is also unclear is the precise relationship between a party's obligation to act in good faith and the obligation imposed by a "commercially reasonable efforts" clause. While much case law has been dedicated to interpreting, albeit without much clarity, "best efforts" and "reasonable efforts" provisions under New York law, the opposite is true with respect to "commercially

reasonable efforts" obligations. The few cases addressing "commercially reasonable efforts" clauses under New York law, however, have held that such a clause is to be analyzed objectively, not subjectively. *See, e.g.*, *Sekisui Am. Corp. v. Hart*, 15 F. Supp. 3d 359, 381 (S.D.N.Y. 2014) (describing the standard for evaluating a "commercially reasonable efforts" requirement as an objective one); *MBIA I*, 842 F. Supp. 2d at 704 ("The requirement that [the defendant] use 'commercially reasonable efforts' in a timely manner provided an objective standard of reasonableness rather than [the defendant's] mere subjective believe about what efforts [it] should take" to satisfy its contractual obligations. (citing *Christie's Inc. v. SWCA, Inc.*, 867 N.Y.S.2d 650, 653-54 (Sup. Ct. 2008))).

This objective standard of reasonableness is in line with New York law's treatment of other contractual provisions. A good faith standard has been held to apply when a contractual provision leaves implementation decisions to the discretion of the promisor. *See, e.g.*, *Travellers Int'l A.G.*, 41 F.3d at 1572, 1576 (stating, in the context of a contract that granted the "power to determine the level of marketing" to the marketing party, that "when a party undertakes specific promotional obligations, its discretion must be exercised in good faith and, in addition, the determination of [the] effectiveness . . . of promotion [has] to be made in good faith" (alterations in original) (internal quotation marks and citation omitted)); *Misano di Navigazione, SpA v. United States*, 968 F.2d 273, 275 (2d Cir. 1992) (explaining that satisfaction clauses "that require the consideration of a 'multiplicity of factors' and involve 'fancy, taste, or judgment[ ]' . . . should be analyzed under a good faith standard." (citing *Action Eng'g v. Martin Marietta Aluminum*, 670 F.2d 456, 461 (3d Cir. 1982))). On the other hand, where provisions do not grant authority to the promisor to exercise his or her judgment, courts have found an objective or "reasonableness" standard to be applicable. *See, e.g.*, *Misano di Navigazione*, 968 F.2d at 275 (noting that satisfaction clauses that require satisfaction as to "commercial value or quality, operative fitness, or mechanical utility . . . are interpreted under a reasonableness standard"); *Christie's*, 867 N.Y.S.2d at 653 (explaining that a contractual provision

using the phrase "reasonably determines" generally "suggests that the parties intended a standard of objective reasonableness to apply" (citing *Misano di Navigazione*, 968 F.2d at 275-76; Restatement (Second) of Contracts § 228 (1981))).

This objective standard is tempered somewhat, however, by considerations of the promisor's business interests. Invoking the rule stated by a California district court, at least one court in this district has held that "[a] contractual requirement to act in a commercially reasonable manner does not require a party to act against its own business interests, 'which it has a legal privilege to protect.'" *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568, 618 (S.D.N.Y. 2013) ("*MBIA II*") (quoting *Citri-Lite Co.*, 721 F. Supp. 2d at 924). This rule is expressed by other district courts evaluating a "commercially reasonable efforts" provision. *See, e.g., Lemond Cycling Inc. v. PTI Holding, Inc.*, No. Civ. 03-5441 (PAM) (RLE), 2005 WL 102969, at *5 (D. Minn. Jan. 14, 2005) ("Although an objective component is instructive as to whether or not [the defendant] acted with commercial reasonableness, there must be a subjective evaluation as well. No business would agree to perform to its detriment, and therefore whether or not [the defendant] performed with commercial reasonableness also depends on the financial resources, business expertise, and practices of [the defendant]."); *Microboard Processing, Inc. v. Crestron Elec., Inc.*, No. 3:09-cv-708 (JBA), 2011 WL 1213177, at *3 (D. Conn. Mar. 29, 2011) (reviewing *Citri-Lite* and *Lemond Cycling* and concluding that "whether and how compliance with the 'industry standards' . . . relates to the 'commercial reasonableness' [the promisor] agreed to must also take into account factors such as the skills and costs associated with [performing under the contract] in accordance with the industry standards compared to the costs to [the promisor] of how it [performed under the contract]").

When the term "commercially reasonable efforts" is not defined by the contract, courts in this district require the party seeking to enforce the efforts provision to establish the objective standard by which the breaching party's efforts are to be judged, in the context of the particular

industry. *See Sekisui Am. Corp.*, 15 F. Supp. 3d at 382 (noting that the plaintiff had failed to provide evidence of the objective standard for commercially reasonable efforts in the FDA-regulatory context); *MBIA II*, 950 F. Supp. 2d at 617 (requiring evidence to define the "commercially reasonable" standard for a particular industry). In the context of an obligation to promote a product, the standard by which a party's efforts are to be measured may also involve a comparison with the party's efforts to promote its other products. *See* Robert L. Haig, N.Y. Practice Series, Comm. Litig. in N.Y. State Courts § 107:17 (4th ed. 2017). A court's evaluation of a party's compliance with a "commercially reasonable efforts" requirement does not involve a hindsight comparison of the party's actual conduct to that which could have been undertaken to produce a better result; a court should evaluate only whether the party's actual conduct was sufficient. *Bear, Sterns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, No. 03-cv-8259 (CSH), 2007 WL 1988150, at *22 (S.D.N.Y. July 10, 2007). At a minimum, though, a promise to use commercially reasonable efforts requires that the promising party undertake at least some activity. *See, e.g.*, *SATCOM Int'l Grp. PLC v. Orbcomm Int'l Partners, L.P.*, 2000 WL 729110, at *20 (S.D.N.Y. June 6, 2000) (finding no commercially reasonable efforts to promote where the defendant "routinely" ignored customer inquiries, "repeatedly failed to pursue marketing leads," and refused to use "*any* print advertising or other 'generally recognized vehicles of promotion' in its territories").

In light of the scant case law defining the phrase "commercially reasonable efforts," and particularly because of the nature of the conduct at issue in this case, it also bears considering the plain meaning of the phrase, and in particular of the word "efforts." *See Greenfield*, 98 N.Y.2d at 569 ("The best evidence of what parties to a written agreement intend is what they say in their writing." (quoting *Slamow*, 79 N.Y.2d at 1018)); *see also Network Publishing Corp. v. Shapiro*, 895 F.2d 97, 99 (2d Cir. 1990) ("[W]e must consider the words [of a contract] themselves for they are always the most important evidence of the parties' intention." (alterations in original) (quoting *Eddy v. Prudence Bonds*

*Corp.*, 165 F.2d 157, 161 (2d Cir. 1947))). *Merriam-Webster* defines "effort" as a "conscious exertion of power," "a serious attempt," or "something produced by exertion or trying." *Effort*, Merriam-Webster, https://www.merriam-webster.com/dictionary/effort (last visited Apr. 23, 2018). These definitions connote a conscious attempt to secure an outcome, or some affirmative action by the party required to exert efforts.

In sum, compliance with a "commercially reasonable efforts" clause requires at the very least some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business interests. A contracting party's efforts are judged objectively in light of proven standards.

Here, the IP Agreement does not specify the efforts that the parties agreed would satisfy Section 6.1(b). Therefore, because the IP Agreement does not define "commercially reasonable efforts," it fell upon Plaintiff to establish the objective standard by which Defendant's efforts are to be judged, which Plaintiff did by introducing the testimony of its expert, James Humphrey. Defendant's expert, Milan Sjaus, provided additional testimony regarding the industry standard that applies. Measured against the customs in the mining industry and its own conduct in promoting its other products, FLS's "efforts" to both promote the Holland Loader products and develop the Acquired Assets fell significantly short of commercial reasonableness.

### a. FLS Failed to Use Commercially Reasonable Efforts to Actively Promote the Products

Before turning to Defendant's failure to promote the products in compliance with Section 6.1(b) of the IP Agreement, the Court notes that not all of the evidence relied upon by Plaintiff is indicative of a breach of the IP Agreement. First, Plaintiff introduced evidence that very little, if any, work was done by FLS to promote the sale of Holland Loader products other than the dozer trap and the loaders, such as tractors and trailers. The IP Agreement, however, did not require Defendant to use commercially reasonable efforts to promote the sale of *all* Holland Loader

products. Instead, it only required the use of commercially reasonable efforts to "actively promote the sale *of Products*." This language suggests that efforts to actively promote at least some of the Products would suffice. Therefore, FLS's failure to actively promote the sale of tractors and trailers by itself was not a breach of the IP Agreement.

Second, FLS's response to the New Zealand Steel request for tender was not commercially unreasonable, and the Court does not consider it a basis for its conclusion that Defendant breached the IP Agreement. FLS has operated for 135 years and has a reputation in the global mining market that it seeks to uphold. FLS requires that any product or system that it sells comply with its internal safety, design, and engineering specifications. Although discussions regarding the New Zealand Steel project began prior to the execution of the IP Agreement, it was not until that agreement was signed that FLS obtained the legal right to use and sell Holland products. Shortly after the IP Agreement was signed, FLS began conversion work on the Holland Loader drawings, transferring the hand-drawn designs to electronic format. That conversion process was not complete at the time that FLS Spokane received the request for tender from New Zealand Steel, a request that sought at least two dozer traps for use in a mining application. Thus, in addition to electronic conversion of the designs, the dozer traps acquired from Holland Loader required design modifications for use in the mining context. Those modifications had also not been completed by the time the request for tender was received. Therefore, it would not have been commercially reasonable for FLS Spokane to bid on the New Zealand project knowing that the strict timelines established by the request for tender would not be met and that FLS would be liable for liquidated damages.

Third, the Court is not persuaded by Humphrey's opinion that FLS could or should have completed the FLS-izing process and even prefabricated the Products by the end of 2012. As Sjaus emphasized, FLS provides its customers with complex solutions, and the products that the company sells are intended to be a part of those solutions. The equipment marketed by FLS is highly

customized and not built until after a sale has been made. This is typical of systems providers in the mining industry. The evidence shows that FLS's customers expected the products that they purchased to be designed in accordance with their specifications, and pre-built products would likely require modifications, eliminating much, if not all, of any advantage of pre-fabricating them. Nor would it be reasonable to expect that the entire FLS-izing process of the Holland Loader products would be completed within six months of the IP Agreement in light of FLS's strict design and safety requirements and the need to convert nearly all of the Holland Loader designs into electronic format.

Additionally, FLS took some initial steps to lay the groundwork for effective marketing of the Holland Loader products. FLS Spokane hired Svatek and Tash, the two individuals with the most knowledge of the products, and placed Tash exclusively in charge of the Holland products, a benefit which the other product lines did not enjoy. The company also began the FLS-izing process of the Holland Loader designs. Plaintiff has established, however, that these initial efforts were wholly insufficient to satisfy Defendant's obligation to use commercially reasonable efforts to actively promote the products.

Based on Humphrey's testimony at trial, the touchstone of commercially reasonable efforts to promote a product in the mining and construction industries is proper planning—planning for market development, planning for product introduction, and planning for bidding. Although Sjaus did not share the same view of the specific substance of the customary business plan processes, he acknowledged the industry-wide standard of creating a business plan. It is clear, therefore, that manufacturers of products and systems for the mining market generally formulate a marketing plan, and that plan generally includes a business strategy, promotional materials, and sales strategies. FLS's failure to use commercially reasonable efforts to actively promote the Holland Loader products can be traced largely to the company's failure to plan. There is no evidence of a clear

marketing plan, and even when Tash proposed an action plan partway through the earnout period, FLS made no apparent effort to implement that plan. Moreover, the IP Agreement required Defendant to use *efforts* to *actively* promote the products. Given the plain language meaning of the word "efforts" and the contract's qualification that promotion was to be "active," the IP Agreement required proactive, rather than reactive, work by Defendant. FLS's work can hardly be characterized in this way.

### 1. Failure to Properly Train Sales Personnel

As Humphrey established at trial, and as accords with common sense, sales personnel must be properly trained on a product if they are to effectively promote it. The key to successful promotion, as Humphrey testified, is an understanding of the operational advantages and applications of a product. This is particularly true in the mining industry, which is by nature risk adverse. It is reasonable to expect that customers would be unwilling to risk much to incorporate new products into their projects without being advised of the strengths and weaknesses of the new products and any additional advantages to be gleaned from their use.

Although each of FLS's subsidiaries possessed the legal right to market and sell the Holland Loader products, there is little evidence that sales staff at offices other than FLS Spokane were sufficiently trained on the products. At the 2013 sales training event in Houston, Svatek was given nothing more than a fifteen to twenty minute window within which to provide training on Holland Loader products, despite the fact that the event lasted three to four days. More egregiously, training materials were not prepared until late 2014—nearly halfway into the earnout period. Even then, FLS made no organized effort to implement that training program, and training was conducted on an ad hoc basis only, and only at a small handful of FLS offices. Yet, FLS has over fifty subsidiaries, two dozen of which work in the bulk material handling group. A large number of FLS sales representatives were thus left unequipped to effectively identify opportunities to promote the

Holland Loader products to FLS customers and to generate customer interest in those products.

### 2. Failure to Prepare Products for Effective Marketing

The evidence establishes that products sold by FLS must first be "FLS-ized," or subjected to rigorous design and safety testing to ensure that they meet the company's high standards. While FLS began this process, it never completed it. Nor were efforts made to finalize conversion and quality checks of the designs within a time frame that would have allowed FLS to effectively promote the products during the earnout period. Instead, no budget was allocated to the conversion process, and the conversion process was not a high priority despite Defendant's contractual obligation to use efforts to actively promote the products. Personnel tasked with conversion performed conversion work only in the absence of other assignments, and the Spokane and India offices which were handling the conversion received merely "left over" resources to be dedicated to the process. A year after the IP Agreement was signed, conversion remained unfinished, with estimates that it would be yet another eight months before the Holland loaders and dozer trap designs would be converted. FLS's stringent standards were not unreasonable, given the company's worldwide reputation and interest in preserving its goodwill with its customers. However, as Sjaus's report explains, a product is ready for market only after conceptual designs have been prepared and *reviewed for fatal flaws*. Thus, FLS's failure to allocate the resources needed to complete the FLS-izing process, which involved design and safety reviews and was also a predicate to delivery of a sold product, was commercially unreasonable.

### 3. Failure to Use General Business Development Tactics to Promote Products

Aside from Emerson's efforts to sell Holland Loader products to CNRL, there is very little evidence of active work to promote the products to potential customers. In comparison with FLS's promotion of its other product lines, advertising of the Holland Loader products was woefully lacking. As Humphrey explained, adequate promotional materials are crucial in demonstrating to

40

customers the operational advantages of the marketed equipment. In a conservative industry adverse to risk, such materials would be even more important. The need for promotional materials was even greater here, as a majority of the FLS sales staff was not properly trained on the Holland Loader products and was ill-equipped to personally explain the products' features, possible applications, and competitive advantages to potential customers.

While FLS appeared at industry tradeshows and presented technical papers at conferences around the world, there is no evidence that it promoted the Holland Loader products at those events.[7] Also, although FLS created some brochures for the Holland Loader products, not all of those brochures were made available on the FLS website, and one of the brochures included a thirty-year-old design drawing. FLS did not complete integration of the Holland Loader website with FLS's site until nearly eighteen months after the IP Agreement was executed. And during the process of moving the Holland Loader web content to the FLS website, FLS cut significant Holland Loader content. Furthermore, while FLS created and published videos on You Tube for its other products, it did not make or publish any promotional videos for the Holland Loader products. Nor did FLS create or distribute animations and other concept drawings to aid potential customers in understanding the Holland Loader products, although FLS routinely did so in connection with its other products. In fact, as late as August 2016, and less than a year shy of the end of the earnout period, FLS had only limited drawings of the Holland loader to offer to customers. Because, as Sjaus explained, opportunities for the sale of products that are marketed as parts of complex systems are identified through general business development efforts, FLS's failure to use its usual business development efforts in connection with the Holland Loader products not only deviated from the industry norm, but also from FLS's own internal practice.

---

[7] Sjaus explained in his report that it is not common for systems providers in the mining industry to advertise at trade shows. However, the evidence suggests that FLS regularly appeared at trade shows; Svatek initially met White at a trade show, and FLS subsequently appeared at trade shows.

### 4. Lack of "Active" Efforts to Promote

Even the interest that was generated in the Holland Loader products cannot be said to be the result of "active" promotional efforts by FLS. While FLS submitted budgetary proposals for projects in 2013 and 2014, including a budgetary proposal for a dozer trap to Southern Ionics Mining in April 2013 and a budgetary proposal to Glencore Antapaccay for a dozer trap in April 2014, the evidence suggests that these proposals were submitted reactively, in response to inquiries FLS received from the potential customers.

Moreover, by August 2013, sales leads were primarily being pursued by Tim Tash and Steve Svatek and largely involved conversations with former Holland Loader customers in the North American market. The requests for quotes at that time were described in email correspondence as "based on requests" for equipment. Email correspondence also recognized that FLS had not "made a strong push to capitalize on the sales structure" in India, Indonesia, and South Africa, regions in which interest for the Holland Loader products existed. Early 2014 sales opportunities in Indonesia and Australia were also identified based on inquiries for Holland loaders. By mid-2015, several of the sixty identified opportunities for sales of Holland Loader products were from former Holland Loader customers who were already familiar with the products. There is no evidence that those sales opportunities were actively pursued.

Other FLS internal documents also reflected an understanding that little active marketing was performed. Even before the plug was pulled in 2015, a R&D proposal prepared by FLS for the dozer trap machine series indicated that, "since the acquisition, *without actively marketing the product*, FLS has received considerable interest in both existing and downsized versions of dozer traps." Darrell White's several emails also confirm that FLS personnel working directly with the Holland Loader products understood that the company had made minimal efforts to promote under the IP Agreement. This evidence establishes that an overwhelming majority of the interest generated in the

Holland Loader products was not the result of FLS's *active* promotion of the products.

The most blatant evidence of FLS's failure to use commercially reasonable efforts to actively promote the Holland products is the decision made in mid-2015 to table the Holland Loader products, despite Defendant's obligations under Section 6.1(b) of the IP Agreement. FLS had a legal right to protect its business interests, including the right to prioritize its product lines based on financial reasons. However, the formal decision to table the Holland Loader products was not merely a temporary fix to a financial problem. FLS introduced no evidence that compliance with its contractual obligations would have crippled it or otherwise caused the company financial hardship. Instead, it was apparent that FLS wished to divest itself of the Holland Loader products and to terminate the IP Agreement, with nearly two years remaining on the earnout provision and with no evidence that any of the financial issues that motivated the 2015 decision would likely continue during those two years. FLS's abandonment of its contractual obligations was apparent when it engaged in discussions with Svatek to sell him back the intellectual property in 2015, and then attempted to sell the IP to another customer in 2016. Even those within FLS who directly worked with the Holland Loader products believed that FLS no longer offered the product line. Paul Emerson, who was responsible at the time for the Holland product line, was under the impression until well into 2016 that FLS was going to return the IP to Svatek and would no longer be offering the Holland products to its customers. Other FLS employees were equally confused and unsure of whether they could respond to customer inquiries for Holland loaders.

In light of FLS's attempts to divest itself of the Holland product line, it comes as no surprise that there is no evidence of any active promotion of the Holland products from mid-2015 to the end of the contractual term. Although FLS continued to respond to customer inquiries, it took no proactive measures to generate customer interest. Even its responses to customer inquiries can hardly be characterized as attempts to actively promote the products. In response to an August

2016 inquiry for a dozer trap feeder to be used in connection with a Mexican mining project, Emerson directed FLS sales personnel to provide a quote only if the feeder fit within a size that FLS had quoted previously and if it was "relatively easy to quote." A couple months later, in October 2016, Paul Emerson's response to an inquiry from Landmark Construction included an internal email chain in which FLS employees expressed concern about "current legal questions" related to the Holland products. Emerson's email to the potential client also indicated that, because Svatek and Tash were no longer with FLS, Emerson was unable to provide a firm quote within the time frame requested by the client. Yet another potential customer was left waiting for several weeks for simple concept drawings.

In addition to demonstrating the lack of efforts to actively sell the Holland Loader products, the 2016 emails also call into question the reasonableness of FLS USA's decision to terminate the employment of Tim Tash and Steven Svatek at the end of 2015. The emails show that FLS—a global behemoth—relied heavily on two individuals—Tash and Svatek—and was ill-prepared to market the Holland Loader products in their absence. As early as September 2012, Darrell White recognized that Svatek and Tash were the only ones capable of writing a proposal for dozer traps because no one else in the Spokane office understood the Holland Loader technology. The ongoing reliance on Tash and Svatek and FLS's apparent continued inability to draft proposals for the Holland Loader products without those two employees highlight the overall failure of FLS to implement a plan that would allow its global sales personnel—not merely two Spokane-based employees—to effectively market the Holland Loader products.

Defendant has argued that FLS was not required to actively promote the Holland Loader products outside of the mining market. While FLS's expertise and dominant presence lies in the mining industry, the IP Agreement does not limit performance to that industry. The contract requires Defendant to use commercially reasonable efforts to "actively promote the sale of

Products" without defining specifically in what market the products are to be promoted. The IP Agreement's definitions of the terms "products" and "business" also suggest that the products were to be marketed outside of the mining industry. "Products" are defined as the various Holland Loader products and any derivatives thereof, and "business" is defined as the "business of the design, development, manufacture, supply, use, maintenance, installation, import, distribution or sale of the Products." The only reference to a particular industry is in the last clause of the definition of "Business," which reads "but excluding any consulting services performed within the metals and mining industry." Because the contract specifically defines the market to which the exception to "business" applies, the lack of a defined market in the definition of the affirmative scope of "business" is telling. This is particularly true in light of the fact that Holland Loader products had traditionally been used in large construction projects and would require design modification in order to be marketable to the mining industry. Had Defendant intended the IP Agreement to be limited only to the industry in which it typically transacts business, it should have included such a subscription in the contract. Absent such a condition, performance under the IP Agreement cannot be said to be limited to promotion of Holland Loader products exclusively to mining customers.[8]

The Court recognizes that FLS made some attempts to sell to the construction industry, including the April 2015 unsuccessful bid in connection with the hydro dam project in Canada and the bid submitted for a port construction project in Rotterdam. In light of the other voluminous evidence of Defendant's breach of the IP Agreement, however, the Court need not determine whether FLS's failure to do more within the construction market constitutes grounds by itself for a finding of a breach.

---

[8] The Materials Handling Brochure created by FLS describes the Holland loader as "well suited" for projects such as highways and airports. Therefore, it appears that FLS intended to market the loader to the construction industry.

### b. FLS Failed to Use Commercially Reasonable Efforts to Develop the Acquired Assets

With respect to Defendant's obligation to use commercially reasonable efforts to develop products that incorporated the Acquired Assets, little to no efforts were made by FLS. Despite the bidirectional loader's feature in the acquisition proposal to the FLS board, the company dedicated scare resources to the product's development. Some engineering time was devoted to the bidirectional loader, with that time billed as overhead rather than allocated R&D, but very little was actually done to develop that product. After acquisition in 2012, concept drawings were produced for the bidirectional loader, but these drawings were simple and did not involve any engineering work. Work on the bidirectional loader was shelved until late 2014, when David Holland acknowledged that FLS had received a number of inquiries for the product but that the company had not made any headway until November 2014. David Holland affirmed in email correspondence that the Buffalo office was "more than capable of undertaking" the project. However, there is no evidence that any further efforts were actually undertaken by FLS Buffalo, or any other FLS entity, to develop the bidirectional loader. Thus, even though 202 hours of labor were expended on the bidirectional loader, and there may have been additional labor charged to overhead, there is no evidence that the result of those hours was anything more than simple conceptual designs. Especially in light of the high ticket price for a bidirectional loader—$15 million per unit—FLS's failure to do more than basic drawings was commercially unreasonable.

Ironically, FLS dedicated more resources to a new dozer trap design, despite the fact that the bidirectional loader was projected to generate much higher profits. Although the dozer trap received more attention from FLS, with 976 hours spent on it by May 2013 and an increased R&D budget devoted to the product in 2014, only 1,341 of the allocated 5,713 hours were used, and the new dozer trap design was never completed. In fact, following the 2015 workshops, Emerson agreed with other management that the dozer trap should be removed from the list of products to

develop. There is no evidence that any resources were devoted to development of the dozer trap after that decision. Furthermore, the increased R&D budget for the dozer trap was approved the year before substantial downsizing measures were taken by FLS. Therefore, FLS's business interests provide insufficient justification for the company's failure to at least use a substantial portion of the R&D hours allocated to the dozer trap in 2014. Although the Court credits Darrell White's testimony that budgeted R&D hours are not always used in their entirety, Defendant's failure to use more than a quarter of allocated R&D hours lends further support to the Court's conclusion. This is especially so in light of the fierce competition that projects undergo to secure R&D funding in the first instance.

\* \* \*

For all of the reasons described, Defendant, itself and through its subsidiaries, breached its duty to use commercially reasonable efforts to actively promote the sale of Holland Loader products and to develop the Acquired Assets under the IP Agreement.

### 2. Damages

Although Plaintiff was shafted by Defendant's breach of its duties under the IP Agreement, the Court is constrained to find in favor of Defendant because Plaintiff has failed to prove by a preponderance of the evidence that it suffered damages as a result of Defendant's breach.

General damages "are the natural and probable consequence of the breach" of a contract. *Biotronik A.G. v. Conor Medsystems Ir., Ltd.*, 22 N.Y.3d 799, 805-06 (2014) (quoting *Am. List Corp. v. U.S. News & World Report*, 75 N.Y.2d 38, 43 (1989)). They include "money that the breaching party agreed to pay under the contract." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) (citing *Am. List Corp.*, 75 N.Y.2d at 44). By contrast, consequential, or special, damages do not "directly flow from the breach." *Am. List Corp.*, 75 N.Y.2d at 43.

"The distinction between general and special contract damages is well defined but its

application to specific contracts and controversies is usually more elusive." *Id.* at 42. Lost profits may be either general or consequential damages, depending on whether the non-breaching party bargained for such profits and they are "the direct and immediate fruits of the contract." *Tractebel*, 487 F.3d at 109 n.20 (citation omitted). Otherwise, lost profits are only recoverable when "(1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties." *Id.* at 109 (citing *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261 (1986)); *Washington v. Kellwood Co.*, No. 05-cv-10034 (SN), 2016 WL 3920348, at *6 (S.D.N.Y. July 15, 2016), *aff'd*, 714 F. App'x 35 (2d Cir. 2017). Lost profits need not "be determined with mathematical precision," but they must "be capable of measurement based upon known reliable factors without undue speculation." *Ashland Mgmt., Inc. v. Janien*, 82 N.Y.2d 395, 403 (1993) (citations omitted). A plaintiff must provide a "stable foundation for a reasonable estimate" of lost profits, or the claim "falls for uncertainty." *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 383 (1974).

By contrast, "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000). A company without past sales can prove lost profits by identifying a comparable company and analyzing that company's actual profit history. *See Kenford Co.*, 67 N.Y.2d at 261. Nonetheless, profits of another entity are relevant only when "plaintiff's business bears a close comparison to the proposed business, the products or services involved are standardized, and the profits do not depend heavily on local or personal management skills." *Schonfeld*, 218 F.3d at 174 (internal citation and quotation marks omitted).

"A defendant's own projections cannot satisfy the requisite level of certainty in situations involving a new product with relatively little sales history." *Inficon, Inc. v. Verionix, Inc.*, 182 F. Supp.

3d 32, 37 (S.D.N.Y. 2016); *accord Upper Deck Co., LLC v. BreaKey Int'l BV*, 390 F. Supp. 2d 355, 361

n.1 (S.D.N.Y. 2005); *Int'l Telecom, Inc. v. Generadora Electrica Del Oriente*, No. 00-cv-8695 (WHP)

(KNF), 2004 WL 784941, at *4 (S.D.N.Y. Apr. 13, 2004). "The burden of proving general lost

profit damages to the requisite level of certainty is even more difficult when the breach of contract

case involves a new business or a unique product line because the plaintiff's proof regarding

damages in these cases face a heightened scrutiny by the courts." *Inficon*, 182 F. Supp. 3d at 37

(citing *Schonfeld*, 218 F.3d at 172). "This heightened scrutiny is applicable to new business ventures

because 'there is no track record upon which to base an estimate' of future sales or profits." *Id.*

(quoting *Schonfeld*, 218 F.3d at 172).

Here, Plaintiff's evidence of damages is nothing more than speculative. Plaintiff's expert

testified that the maximum earnout would have been reached had FLS used commercially reasonable

efforts to promote and develop the products. That opinion was based on basic math and on FLS's

internal forecasts, which include the deal memorandum that was prepared for the FLS board of

directors prior to execution of the IP Agreement and other projections contained in R&D

proposals. None of these documents were prepared as a sales projection to be included, for

example, in FLS financial statements. Rather, they were prepared for the purpose of securing R&D

funding. Darrell White testified that the figures contained in the initial memorandum presented to

the board of directors were not based on any historical data. Instead, the sales projections were

based on the dollar amounts that he believed the board of directors would require in order to

approve the acquisition. While White's choice of words was more judicious, the Court understood

his testimony to be that he and a colleague had manufactured those figures with scant support in

order to obtain approval of a deal that White wanted to proceed. It is reasonable to likewise infer

that the numbers reflected in the subsequent R&D proposals were not grounded in any historical

data, but were instead created with the goal of making the R&D projects more competitive internally

and, thus, more likely to be funded. In fact, in 2015, Emerson acknowledged that the forecasted sales could not be substantiated or justified.

In light of this, the Court cannot conclude that the projections contained in the 2012 memorandum or the subsequent R&D proposals are sufficiently reliable indicators of the gross sales of Holland products that would have resulted had FLS complied with Section 6.1(b) of the IP Agreement. This is especially true because these products had historically sold in the construction industry, not in the mining industry and not with the proposed mining modifications. Further, the equipment to be developed, the bidirectional loader and the new dozer trap, had never been sold. Without any historical data to support the projections in FLS's internal documents, the Court simply cannot find that those figures provide a sufficiently certain and reliable baseline.

Plaintiff also produced no evidence of sales of similar products by which a comparison may be made. In fact, the only evidence that could be deemed a comparator is evidence of Defendant's expert's personal success in his employment with one of FLS's competitors. Yet, this also fails to provide the certainty required for a lost profits award. Although Sjaus testified that he was able to grow Sandvik's bulk materials handling division to over $200 million in revenue, he did so over the course of nearly ten years. Sjaus' work was done within the North America market, not a global market like that of FLS, and there is no evidence regarding the specific products that Sjaus promoted and sold. Indeed, Sjaus acknowledged that Holland Loader products were not compatible with his large ticket deal, the 2014 Vancouver contract.

The little historical data in evidence in connection with past sales of Holland products also fails to provide a baseline by which to calculate damages. Svatek testified that the only sales of Holland Loader products between 2002 and execution of the IP Agreement in 2012 were of a refurbished loader, which sold for approximately $500,000, two trailers, and spare parts. However, Svatek also testified that HLC was not in a position to effectively market and sell its products, and

that the company entered into the IP Agreement in order to garner broader sales supports for its products. Svatek's previous sales had also been to construction customers and did not include the design modifications that FLS identified as necessary to sell in the mining industry. Furthermore, the sale of only one loader in a ten-year period cannot indicate with sufficient certainty the number of sales that would have been made during the five-year earnout period.

In a letter requesting post-trial briefing on the issue of damages, Plaintiff cites to the Second Circuit's opinion in *Sir Speedy, Inc. v. L&P Graphics, Inc.* for the proposition that a finder of fact may make a "just and reasonable estimate" of damages based on "probable and inferential" proof when a breaching party's conduct frustrates the ability to calculate damages. *See* ECF No. 127 (quoting *Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992)). The Court denied the request for post-trial briefing, but notes that *Sir Speedy* does not assist an argument that damages may be calculated based on the evidence presented at the trial here.

In *Sir Speedy*, the defendant entered into a franchise agreement with Sir Speedy after being provided with two documents that described the average financial performance of Sir Speedy printing centers. 957 F.2d at 1035. After five years of mediocre operation by the defendant, Sir Speedy brought suit to recover unpaid royalties and other fees. *Id.* at 1036. The defendant brought counterclaims against Sir Speedy for, among other claims, breach of contract, asserting that Sir Speedy had failed to provide certain services and assistance promised in the franchise agreement, and that Sir Speedy's breach resulted in the defendant's lost profits. *Id.* A jury awarded the defendant damages after finding that Sir Speedy had indeed breached the franchise agreement, by, *inter alia*, failing to provide the defendant with a proprietary printing system and failing to provide continuing assistance. *Id.* The district court set aside the damage award, concluding that the documents showing the average financial performance by Sir Speedy centers provided an insufficient basis on which to calculate damages with a reasonable degree of certainty. *Id.* The

Second Circuit disagreed, explaining that

> [t]he fact that the figures were given by Sir Speedy as a presumably
> good faith indication of what [the defendant] could earn if he
> purchased a franchise, and the evidence that in at least one region
> during [the defendant's] period of operation the actual franchise
> performances out-paced Sir Speedy's projections, meant the Sir Speedy
> documents relied on by [the defendant] provided the jury with a
> reasonable basis for inferring, without speculation, a range of profits
> that could reasonably have been expected.

*Id.* at 1040.

Here, the internal forecasts produced by FLS contain sales projections for the key Holland

Loader products. However, these forecasts are unlike those in *Sir Speedy*. The April 2012

memorandum contains admittedly manufactured numbers, and the other forecasts were created for

the purpose of securing R&D funding. There is no evidence that would permit the Court to

conclude that the forecasts were a good faith estimate of the actual sales that FLS expected.

Moreover, absent here is any established and reasonable indicator of the accuracy of those

projections. The forecasts in *Sir Speedy* were described as being an average of actual sales achieved

by other franchises, and evidence was presented in that case of at least one other franchise that met

and exceeded the figures. Here, no such historical data was introduced.

In light of the lack of reliable historical sales data and comparator products, there is

insufficient evidence on the basis of which the Court may calculate with sufficient certainty the lost

profits that Plaintiff sustained as a result of Defendant's breach of the IP Agreement.[9]  Plaintiff has

---

[9]  In its ruling on Defendant's motion to preclude testimony by Plaintiff's expert, the Court precluded evidence of a
third method of calculating damages proposed by Humphrey.  That third method was based on a calculation of the
percentage of the global mining market that FLS would have had to capture in order to meet and exceed the $4 million
earnout cap.  Had his testimony not been precluded, Humphrey would have testified that the size of the loader industry
during the period of 2012 to 2015 was over $10 billion.  Therefore, FLS would have needed to capture only one-half of
one percent of that market to meet the maximum earnout under the IP Agreement.  Had the Court not precluded this
testimony, it would nonetheless be insufficient to prove with reasonable certainty Plaintiff's damages.  While capturing
one-half of one percent of a market does not sound like a daunting task, Plaintiff had been able to sell only one loader in
the prior ten-year period.  Therefore, a conclusion that the use of commercially reasonable efforts would have
necessarily allowed FLS to capture that percentage of the market would still have relied on speculation regarding the
actual sales of Holland products that would have resulted.

not requested equitable relief. Therefore, although Plaintiff successfully proved that Defendant breached Section 6.1(b) of the IP Agreement, the Court must find that Plaintiff has failed to prove its breach of contract claim.

## III. CONCLUSION

"*Caveat emptor*"—let the buyer beware—is not the right motto for this case. After all, for a modest price, the buyer in this case got everything it wanted: the devoted services of Svatek, a talented and dedicated mining engineer, and all of the intellectual property of Holland Loader. When it decided that it was in its interest to do so, FLS fired Svatek with little warning, and then shelved the Holland Loader product line—a proud American brand swallowed up and forgotten by an international behemoth.

"*Caveat contractor*"—let the contractor beware—is a better fit. As the Court has found, Defendant entered into its contract without the intent to comply with its terms: astoundingly, Defendant's counsel stated as much during his closing argument, as if that fact excused the company's non-compliance, rather than explaining it. The people at FLS responsible for administering the contract for most of its life were unaware of its requirements. Not surprisingly, they did little to meet them. FLS complied with the contract's terms only to the extent that compliance required minimal expense of its own resources. Indeed, Defendant took the position throughout this litigation that its obligation to comply with the contract's terms was capped by what it unilaterally believed was in its business interest, despite the contract's clear language requiring that it exert reasonable efforts to achieve the contract's goals. Confronted with this litigation, Defendant went so far as to argue that terms of the contract indisputably drafted by its own lawyer did not reflect the terms that it had agreed to. *Caveat contractor* was not the guiding principle for Svatek in his dealings with FLS. Instead he trusted, and he lost.

Nonetheless, the Court is constrained by the proof and is not able to award Plaintiff damages on this record. At law, this is the correct result.

The Clerk of Court is directed to enter judgment in favor of Defendant, to terminate all pending motions, and to close this case.

SO ORDERED.

Dated: May 2, 2018
New York, New York

_____
GREGORY H. WOODS
United States District Judge